**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| SEAN GAVIN, Derivatively on Behalf of BUMBLE, INC., | Case No: 1:24-cv-01331 |
| Plaintiff, | |
| v. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| LIDIANE JONES, WHITNEY WOLFE HERD, ANURADHA B. SUBRAMANIAN, ANN MATHER, R. LYNN ATCHISON, ELISA A. STEELE, PAMELA A. THOMAS-GRAHAM, MATTHEW S. BROMBERG, JONATHAN C. KORNGOLD, AMY M. GRIFFIN, SISSIE L. HSIAO, SACHIN J. BAVISHI, and JENNIFER B. MORGAN, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and, | |
| BUMBLE, INC., | |
| Nominal Defendant. | |

Plaintiff Sean Gavin ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Bumble, Inc. ("Bumble" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy the Individual Defendants' (defined below) violations of state and federal law that have occurred from November 7, 2023 through August 7, 2024 (the "Relevant Period") and have caused substantial harm to the Company.

2.      Throughout the Relevant Period, the Individual Defendants (defined below) provided investors with material information concerning Bumble's 2023 fiscal year revenue and expected guidance for the fiscal year 2024. The Individual Defendants' statements included, *inter alia*, confidence in their understanding of the desires in their consumer market, growth in revenue per user on the back of the Company's new elevated subscription tier, and a full app relaunch to integrate features the Company claimed would expand their market to more users with a focus on an increase in younger users on their platform.

3.      The Individual Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning Bumble's relaunch strategy, including: Premium Plus and base tiers, focused engagement and more personalized experiences for younger users, and enhancing premium offerings for paid subscription members. Such statements absent these material facts caused Plaintiff and other shareholders to purchase Bumble's securities at artificially inflated prices.

4.      The truth began to emerge on February 27, 2024, when Bumble issued a press release reporting disappointing fourth quarter fiscal 2023 results despite the recent launch of the Premium Plus subscription tier in December 2022. During the subsequent earnings call, management announced that the Premium Plus tier would be revamped as part of the planned

Bumble app relaunch, as it "did not have a clear enough market fit" at launch.  As a result, Bumble lowered its guidance for full year 2024.

5.      In response to this news, Bumble's stock price declined from $13.18 per share on February 27, 2024 to $11.23 per share on February 28, 2024.  However, the Individual Defendants materially misrepresented and/or concealed the true risks they faced with respect to capturing the correct balance and mix of people in its customer base and effectively monetizing its subscription tiers.

6.      Investors remained in the dark as Bumble reported its financial results for its first quarter fiscal 2024 results on May 8, 2024.  At that time Bumble reiterated the Company's full year 2024 decreased guidance.

7.      On August 7, 2024, Bumble issued a press release reporting mixed second quarter 2024 results.  During the corresponding earnings call, the Individual Defendants disclosed that the app relaunch was not going to plan and the Company would need to "reset" its outlook to refocus on the "consumer ecosystem" and "rebalance Bumble subscription tiers," including a pause in the revamp of the poorly received Premium Plus tier.  On the back of this news, Bumble drastically cut its fiscal year guidance for a second time.  As a result, the price of Bumble stock declined from $8.06 per share on August 7, 2024 to $5.71 per share on August 8, 2024.

8.      Meanwhile, the Individual Defendants caused and/or permitted the Company to engage in harmful share repurchases, causing damage to the Company in excess of $123 million, among other damages as a result of the wrongdoing alleged herein.  Plaintiff thus seeks to recover, for the benefit of the Company, all damages suffered by it.

## JURISDICTION

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Securities Exchange Act of 1934 (15. U.S.C. § 78j(b)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

10.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) the Company maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

12.     In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce,

including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

**Plaintiff**

13.     Plaintiff is, and was at relevant times, a shareholder of the Company.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**Nominal Defendant**

14.     ***Nominal Defendant Bumble*** is a Delaware corporation with its principal executive offices located at 1105 W 41st Street, Austin, TX 78756. During the Relevant Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "BMBL."

**Director Defendants**

15.     ***Defendant Ann Mather*** ("Mather") has served as a director of the Company at all relevant times, having served as Chair of the Board since March 2020 and as Lead Director since January 2024. She also serves as the Chair of the Nominating and Corporate Governance Committee.

16.     ***Defendant R. Lynn Atchison*** ("Atchison") has served as a director of the Company at all relevant times since October 2020. She also serves as the Chair of the Audit and Risk Committee.

17.     ***Defendant Elisa A. Steele*** ("Steele") has served as a director of the Company at all relevant times since July 2020.  She also serves as the Chair of the Compensation Committee and as a member of the Audit and Risk Committee.

5

18.     *Defendant Pamela A. Thomas-Graham* ("Thomas-Graham") has served as a director of the Company at all relevant times since August 2020.  She also serves as a member of the Audit and Risk Committee and the Compensation Committee.

19.     *Defendant Matthew S. Bromberg* ("Bromberg") has served as a director of the Company at all relevant times since July 2020.

20.     *Defendant Jonathan C. Korngold* ("Korngold") has served as a director of the Company at all relevant times since January 2020. He also serves as a member of the Compensation Committee.

21.     *Defendant Amy M. Griffin* ("Griffin") has served as a director of the Company at all relevant times since February 2021. She also serves as a member of the Nominating and Corporate Governance Committee.

22.     *Defendant Sissie L. Hsiao* ("Hsiao") has served as a director of the Company at all relevant times since October 2023.

23.     *Defendant Sachin J. Bavishi* ("Bavishi") served as a Company director from January 2020 through to his resignation, effective January 2, 2024.

24.     *Defendant Jennifer B. Morgan* ("Morgan") served as a Company director from February 2021 through to her resignation, effective July 30, 2024.

25.     Defendants Mather, Atchison, Steele, Thomas-Graham, Bromberg, Korngold, Griffin, Hsiao, Bavishi, and Morgan are collectively referred to herein as the "Director Defendants."

**Officer Defendants**

26.     *Defendant Lidiane Jones* ("Jones") has been the Chief Executive Officer ("CEO") and Director of Bumble since January 2, 2024. As a result of the wrongdoing alleged herein,

Defendant Jones now faces liability as a named defendant in the factually related Securities Class Action (defined below).

27.     ***Defendant Whitney Wolfe Herd*** ("Wolfe Herd") was CEO of Bumble from 2014 until January 2, 2024.  Defendant Wolfe Herd is Bumble's founder and serves as Executive Chair since January 2, 2024.  As a result of the wrongdoing alleged herein, Defendant Wolfe Herd now faces liability as a named defendant in the factually related Securities Class.

28.     ***Defendant Anuradha B. Subramanian*** ("Subramanian") was, at all relevant times, the Chief Financial Officer ("CFO") of Bumble.  As a result of the wrongdoing alleged herein, Defendant Subramanian now faces liability as a named defendant in the factually related Securities Class Action.

29.     Defendants Jones, Wolfe Herd, and Subramanian are collectively referred to herein as the "Officer Defendants."

30.     The Director Defendants and Officer Defendants are collectively referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

31.     Launched in 2014, Bumble is an American company which purports to be a dating app (the "Bumble App") and proclaims to be one of the first dating apps built with women at the center, where women make the first move. Bumble App claims to be a leader in the online dating sector across several countries, including the United States, the United Kingdom, Australia and Canada.  As of the year ended December 31, 2023, the Bumble App had approximately 2.5 million Bumble App paying users.

32.     In addition to the Bumble App, Bumble owns a suite of other apps, including Badoo, Fruitz, Bumble BFF, and Official.  These apps include a variety of different intention-based dating algorithms and platforms, providing users with unique online dating strategies.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

33.     On November 7, 2023, the Company held an earnings call corresponding to its third quarter fiscal year 2023 results during which the Company promoted their new "Premium Plus" subscription tier and introduced Lidiane Jones, who Bumble announced would be taking over the role of CEO effective January 2, 2024.

34.     On the November 7, 2023 earnings call, Defendant Wolfe Herd, Bumble's founder and then-CEO, promoted Bumble's upcoming "Premium Plus" subscription tier:

> As we mentioned last quarter, we are excited to be introducing 2 new subscription tiers for our members. These will not only enhance our current offerings but also enable us to better and more directly serve the needs of our high-intent, serious dating customers and Gen Z users.
>
> Our higher tier, which will be called Premium Plus, aims to elevate our power members' dating experience to improve their chances for a match. Premium Plus is actively being tested in several countries with promising initial results. Our lower-price tier is also currently in limited testing. This tier is focused on helping our younger members express their personalities on a deeper level and find connection in fun and social ways. Our goal is to expand testing and launch both tiers in coming quarters.
>
> As always, we augment these new features with under-the-hood optimization that are meaningful in improving the user experience.

35.     During a question-and-answer portion of the same earnings call, Defendant Wolfe Herd further elaborated on the Premium Plus subscription tier in a discussion with an Evercore analyst as follows:

> <Q: Shweta R. Khajuria – Evercore ISI Institutional Equities – Analyst> Let me try two please … And then second is, could you provide more color on the 2 product subscription tiers, please, the one that's lower priced in terms of the timing, the pricing and the rollout for both plans, please?

***

<A: Defendant Wolfe Herd> Yes. Thanks for the question. So let's talk about the 2 different subscription tiers. ***We'll start at Premium Plus. We are really excited about Premium Plus. I want to underpin this by saying that it has actually been largely one of the most requested features, in and of itself, that we have received over a long time now because it delivers a more curated, more high intent, more, we could say, thoughtful experience, right***? You have a better chance of a match and there's a lot of other layers that come with this Premium Plus experience. ***We've been really pleased with the very early indicators and the early results we're seeing***. So you can expect an update in the coming quarter.

And then moving to base tier, this is really focused on the different types of engagement and the more personalized experience that particularly Gen Z enjoys. So the way, call it, 18- to 22-year-olds are looking to express themselves, on themselves, is actually quite different than the older cohorts, even their peers just a few years older. And we are so good at listening, being on the ground and understanding what this age group is really looking for when it comes to meeting people. And so that's what base tier is all about. It is in early testing right now, and we don't have specific timing or pricing to share publicly today, but I can tell you that it will be a low price point. This is really with the intention of expanding payers and creating a more engaging experience for that next generation.

Meanwhile, on the other side of that barbell, ***Premium Plus will be a much more premium experience than that, obviously, and more premium to the current premium offering. And we believe that the blend of this will be protective to ARPPU while expanding payers***.

(Emphasis added).

36.     Defendant Wolfe Herd also discussed the benefits of the CEO transition with a

Goldman Sachs analyst during the question-and-answer segment:

<Q: Alexandra Christine Kasper Steiger – Goldman Sachs Group, Inc. – Research Analyst> Congrats, Whitney, on your new role. Maybe two questions on the transition here, first one on timing. Could you maybe elaborate a little bit more on the timing of the announcement? When you look at some factors inside the company versus outside, why do you think this is the right time for you to make that move?

And then second, listening to some interviews with Lidiane, it appears that she has a very valuable background in terms of AI and bringing AI features into existing products and services. To what extent is this going to be a focus for her at Bumble?

And could it fast-forward some of the AI initiatives you have played out in the past few quarters?

<A: Defendant Wolfe Herd> Thank you for the questions. So the short answer was we didn't make this decision based on timing. This was about finding the right successor, the right leader. The Board and I have been focused on an extremely thoughtful and very deliberate succession plan for some time, and so finding the right leader was really the key. And you already touched upon just one of many of Lidiane's incredible strength, and we'll get into that in a moment. But I have to say the short answer is, with someone as remarkable as Lidiane, and keeping me engaged as the Executive Chair focused on my strength, leaning into my superpowers, right, I think so many of the amazing efforts around our mission, our brand, our marketing, our social impact, our customers, those are things that I'm deeply passionate about and do extremely well.

So allowing me to move beyond the day-to-day and get into this founder mindset on behalf of Bumble Inc., you pair her with me, it's a remarkable opportunity. I don't think people are fully recognizing how powerful that can be. So really, ultimately, it's going to allow us to both innovate but drive growth across the business, drive new products.

And now moving into your second question, let's just talk about Lidiane for a moment. So first and foremost, she is incredibly unique. She is not only wildly intelligent and capable, she has insane followership. I mean her people that she has led love her. That was always going to be critical for a leader to be my successor. And then when you double-click on her qualities and her experience, she's a software engineer. She speaks system. She speaks the language of technology. She is going to get in there and be not only a technology mind but an incredible product innovator. She is a customer-first product person. If you look at the products she's worked on, These are products we love and adore.

So with the note on AI, the short answer is yes. She is going to show up on day 1. We've been doing so much work on the back end of AI already, ranging from, I would call it, 3 main buckets: tools, where we can integrate different AI tooling to enhance the customer experience, to supercharge the under-the-hood efforts and then also drive efficiencies and drive strength as far as the leadership team and the broader teams go. The second bucket is really the noncustomer-facing efforts that she's going to be leaning into. This is supercharging our algorithms, further enhancing our safety and moderation efforts, using AI as this underpinning supercharge effort to bring the world closer together and to drive healthy relationships. And then the third bucket is the customer-facing stuff. This is what we're all reading about and thinking about all day. This is where generative AI comes in.

She has done this. She knows this. It is natural and native to her. It's not something she needs to learn when she arrives. She will show up day 1 ready to roll. And so

we're so excited about the opportunity, what this means for the member journey, the member experience. And we think this gives us a massive competitive edge.

So with that, I hope you can hear it in my voice, I am in this to win this. She is so excited, and I think we are going to embark on Bumble's most exciting chapter yet.

37.     During the same call, Defendant Subramanian detailed the Company's full-year 2024 outlook as follows:

> ***As we look ahead to 2024, our fundamental strategy remains unchanged, and we are very excited about the future of our business***. We have an exceptional brand that is loved and used by nearly 4 million paying users around the globe and growing. We have a strong product pipeline that leverages innovative technologies while prioritizing safety for our users. We are just beginning to realize the potential of our apps, and we see tremendous opportunity to continue to expand our reach in more countries.
>
> As we work to refine our planning for next year, we expect another year of solid growth for our family of apps. At the same time, our preliminary outlook also takes into consideration the early stage of our planning process, our leadership succession plan, the trends we are seeing and expected headwinds from FX. As such, our initial assumptions for 2024 are for total Bumble Inc. year-over-year revenue growth rate to be at least in the low teens. This assumes approximately 150 basis points of estimated year-over-year headwinds from FX. On an FX-adjusted basis, this would translate to a growth rate of approximately 15%.
>
> As we finalize our investment priority for next year, we will continue being disciplined on our spend. We expect full year adjusted EBITDA margin to expand between 50 to 100 basis points next year. We will share a more comprehensive outlook in our next earnings call when we discuss Q4 results.
>
> Second, in our U.S. Healthcare segment, we expect profitability to improve from optimizing the clinic footprint, growing patient panels and realigning costs. Third, we expect growing contributions from retail initiatives, including sequentially improving retail comps and margin expansion programs. Finally, seasonality plays a role in our business, benefiting the second quarter, which is usually the height of the cough, cold, flu season in the U.S. and is when Boots U.K. sees significant profit driven by the holiday season.

(Emphasis added).

38.     Defendant Subramanian elaborated further during the question-and-answer portion of the call, answering a question from an analyst at JPMorgan Chase as follows:

<Q: Cory Alan Carpenter – JPMorgan Chase & Co.> . . . And then Anu, thank you for the initial '24 guidance. Curious, at a high level, any framing that you would put around expected contribution from Bumble App, Badoo or ARPPU versus payers?

<A: Defendant Subramanian> … To your second question, just to elaborate a little bit on how we are thinking about 2024 guidance, now obviously, as you can imagine, we are still very much in the planning stages for next year and there are still a lot of moving parts in terms of how we are thinking about 2024. I will say that there is a ton of excitement around what the product road map looks like, what our international plans are. And the teams are very, very deep in the middle of putting all of those on paper. And so far, we are very, very excited about what this means for us for next year.

We wanted to provide some high-level numbers, so all of you can have some context going into next year, recognizing that we have a CEO transition succession in place. And so we will be evolving our thinking as we get into our Q4 earnings and into 2024 specific guidance. Right now, we are thinking about total Inc. revenue, like I said, at least in the low teens. We do have a 1- to 2-point of FX headwind next year.  So that's why on an ex FX basis, on a like-for-like basis, you're talking about Inc.-level growth of about 15%. That's how we're thinking about total 2024 guidance.

If you look at the components of it, we are very, very excited that we will see strong contributions from Bumble as well as Badoo, which is on a good path to stabilization. Bumble BFF will largely be a contributor from a user growth perspective. We do have some monetization plans, but a lot of it will still be in testing next year. And Fruitz and Official are also exciting additions to the business. For Bumble App, again, more to come on that. But you should assume that we are looking at revenue growth rates slightly above where the company growth rates are. So let's say, low to mid-teens is where we are looking at Bumble App guidance.

39.      Also, on November 7, 2023, the Company issued a press release announcing

Bumble's third quarter fiscal year 2023 results for the quarter ended September 30, 2023. Therein,

Defendant Wolfe Herd stated:

Our strong third quarter results reflect our powerful brand, commitment to innovation, and relentless focus on helping people connect with one another. ***By continuing to execute successfully on growth initiatives, we are strengthening our market leadership in online dating and making progress on the sizable opportunity beyond dating.***

(Emphasis added).

12

40.     On November 28, 2023, Defendant Subramanian presented on behalf of Bumble at the 2023 UBS Global Technology Conference. During the call, in response to a question on the topic, Defendant Subramanian again promoted the Company's new Premium Plus subscription tier and discussed its place among Bumble's existing subscription tiers:

> <Q: Christopher Louis Kuntarich – UBS Investment Bank – Analyst> Got it. And just moving on to the 4 tiers that you have. So you have Bumble Boost that we talked a little bit about earlier and then Premium already in the market and then you're testing planning to launch the new tier below Boost, the Bumble Bizz, and then you're going to have the Bumble Premium Plus a tier above the Bumble Premium. So I guess just how is testing coming along? And like what are you looking for really for these different tiers that really start scaling here?
>
> <A: Anuradha B. Subramanian> Yes. So when we thought about adding additional tiers, we really thought about it from the point of what the user pain point was, right? *And if you think about Premium Plus, we had heard from a lot of our existing premium users that they would be willing to pay a lot more for a curated experience that came in at a higher price point that allowed them to shorten the length and time from onboarding to a match* as an example, right? So the goal for Premium Plus is really much more around how do you improve and increase the relevance of the matches that we are giving you and make it much more appealing to that cohort of users. *And I think we do expect to upsell users from Bumble Premium to Premium Plus, and that should be a nice RPP [Revenue Per Payer] driver for us.*
>
> And then on the Bizz tier, the goal was really to say, we have a lot of people, especially the younger cohorts that use the app for free, but are never probably going to pay for Bumble Boost or Bumble Premium right now because they just don't find -- feel the need to. So we said, okay, how do you create products that they would be willing to pay for, right? How do you create things that allow them to be more expressive, right, whether it's stickers, images, whatever the case might be? So that's how we started to think about the lower tier. And that should be a nice sort of driver of payer penetration because, again, these are users that are using the app daily quite actively. It's just about getting them to open up their wallet and pay for something.

(Emphasis added).

41.     The above-refenced statements were materially false and/or misleading. The Individual Defendants created the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth on the back of its

tiered-subscription options and subsequent app relaunch, while also downplaying the potential disruption to Bumble's brand and reputation caused by the imminent change in leadership.  In truth, Bumble's Premium Plus subscription plan did not have a clear market fit and would very quickly need to be revamped.  Bumble's tiered-subscription options were ill equipped to provide the claimed revenue per user benefit to the Company's faltering market share, particularly regarding user growth and monetization. The Individual Defendants misled investors by providing the public with materially flawed statements of confidence and growth projections which did not account for these variables.

## **THE TRUTH BEGINS TO EMERGE**

42.     On February 27, 2024, the Company reported fourth quarter and full year 2023 results and, pertinently, cut their full year 2024 guidance as follows: total revenue growth of 8% to 11% and Bumble App revenue growth of 9% to 11%.  Regarding the adjusted EBITDA margin growth: at least 300 basis points, which excludes expected severance and other non-recurring charges related to the transformation initiative of between $20 million and $25 million.

43.     During an earnings call following Bumble's updated guidance, Defendant Jones also debuted a "bold plan to transform Bumble" that she claimed would "lead the company to its next phase of growth and innovation."  She also stated:

> We are taking significant and decisive actions that ensure our customers remain at the center of everything we do as we relaunch Bumble App, transform our organization and accelerate our product roadmap.

44.     During the same-day earnings call, Defendant Jones provided details on the launch of the Premium Plus subscription tier and the planned app relaunch, stating:

> Over the past 18 months, we launched a number of new features in Bumble App, which while individually promising, have in aggregate slowed the overall app performance and cluttered the user experience. ***Additionally, our new pricing tier***

*introduced last December, Premium+, has also not had a clear enough product market fit.*

These are things we strongly believe are in our control to solve, and we're doing so with 4 major steps. ***First, in Q2 of this year, we plan to reignite Bumble's strength by relaunching Bumble App with a compelling modern experience, geared toward capturing a broader audience and aimed at having a stronger appeal to younger users, easing the profile creation experience, optimizing the core performance of the app, and strengthening our AI capabilities to enhance fake account detections and bring profile picture insights to lead our customers to success faster.***

As a part of this release, ***we will also revamp our Premium+ offering***. These efforts will be a significant moment of evolution for us in bringing women's empowerment to the core of our experience. This relaunch will also provide us with a strong platform for ongoing innovation. It will come with a new marketing campaign across our core markets, extending our reach and showcasing the benefits of our offerings. This is the first major overhaul of Bumble App in the past 2 years, and I'm very proud of our team for embracing a faster pace of innovation and marking the start of a new phase of customer experiences in the online dating category.

*** 

***The steps we're taking today set the stage for our next chapter of growth***. We have work to do, but you have my full commitment that we'll innovate and sharpen our focus on execution to create a durable foundation for our business. I look forward to meeting our stakeholders to better understand their needs in the weeks and months ahead. ***And we'll be open and transparent in communicating progress on our strategy as we move forward.***

(Emphasis added).

45.    Additionally, during the same earnings call, the Company unveiled slashed guidance for the full year 2024; Defendant Subramanian stated:

Now moving on to our outlook for 2024. As Lidiane just mentioned, we are adjusting our 2024 revenue outlook to reflect Bumble App's slower-than-expected start to the year and app-specific execution challenges. We feel confident that these issues are within our control, and we are actively working to resolve them. We expect that the Q2 relaunch of Bumble App, along with the launch of other key features on our product road map, will reaccelerate growth in the second half of 2024.

***As a result, for full year 2024, we estimate total Bumble Inc. revenue growth rate of 8% to 11%.*** This assumes FX will be approximately a 1-point headwind during

the year. We expect Bumble App revenue to grow between 9% to 11% year-over-year. Our Bumble App revenue outlook includes expectations for full year net adds of approximately 350,000 to 400,000. On the cost side, the bold actions we announced today around our workforce transformation allow us to gain significant operating leverage and put us on a strong path towards our goal to continue expanding margins.

We estimate future annualized OpEx savings from this workforce reduction to be approximately $55 million, of which we expect to selectively reinvest approximately $15 million in areas of product engineering, safety and brands that will help drive long-term growth. As a result, for 2024, we expect at least 300 basis points of year-over-year adjusted EBITDA margin expansion.

In 2024, we expect to incur approximately $20 million to $25 million of severance and other related charges primarily in the first half related to this transformation, and our adjusted EBITDA outlook excludes the impact of these charges. For Q1, we expect total revenue between $262 million and $268 million, representing a growth rate between 8% to 10%. We expect Bumble App revenue to be between $211 million and $215 million,
representing a growth rate between 9% and 11%.

Our Bumble App revenue outlook includes expectations for sequential net adds of approximately 30,000 to 40,000 in Q1. We estimate adjusted EBITDA will be between $67 million and $70 million, representing 26% margin at the midpoint of the range.

(Emphasis added).

46.     Similarly, during the subsequent question-and-answer portion of the call, Defendant Subramanian elaborated on the financial impacts and projects related to the shortcomings of the Company's launch of the Premium Plus subscription tier and the planned app relaunch, stating the following:

<Q: Alexandra Christine Kasper Steiger – Goldman Sachs Group, Inc. – Research Analyst> . . . And then one follow-up for Anu on the '24 guidance. So I do want to ask about your updated '24 guide and some of the assumptions that went into it now that Q1 is calling for a more pronounced deceleration in growth. So could you maybe talk about what are you seeing in the business today that is informing your view? And in that context, could you also elaborate a little bit more on like the execution challenges you referenced in your prepared remarks?

***

16

<A: Defendant Subramanian> Sure. Thanks, Lidiane. Alex, so maybe I'll just break down the guidance a little bit, starting with Bumble App and what has changed for us from our prior guidance. So while our top of the funnel has remained strong in many of our global markets, we are seeing a slower-than-expected start to the year, primarily in the U.S., and the usual Q1 seasonal rebound that we normally expect to see has been less pronounced than in the past.

***Second, as Lidiane said in her prepared remarks, some of the newer products such as Premium+, which we launched at the end of December, while they have been revenue positive, they are not showing the incremental uplift that we would like to see and that we had originally anticipated. And so for these reasons, we are adjusting our revenue outlook for Bumble App to be 9% to 11% for the full year.***

***And as you've heard today, we are taking immediate and swift actions to make the changes that we need to make to the product road map.*** And with the planned relaunch of the app in Q2, which will be accompanied by the marketing campaign, we expect that our revenue will accelerate in the second half post this launch. And then we have a slew of other features that we are excited about on the product road map that we will then proceed to launch with in the second half of the year. So hopefully, that gives you a flavor for how we're thinking about Bumble App for the rest of the year.

(Emphasis added).

47.     The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the November 7, 2023 earnings call and November 23, 2023 presentation wherein the Individual Defendants praised the upcoming launch of their new Premium Plus subscription tier and claimed that the new offering would not only protect the Company's average revenue per paid user but would further provide revenue growth per user as subscribers would purportedly move up the tiered subscriptions.

48.     Investors and analysts reacted immediately to Bumble's revelation. The price of Bumble's common stock declined dramatically. From a closing market price of $13.18 per share on February 27, 2024, to $11.23 per share on February 28, 2024.

49.     Notwithstanding the Individual Defendants' disclosures during the call, they continued to mislead investors by misrepresenting their understanding of the issues they claimed

the new pricing tier and Bumble app relaunch were aimed to address in their issuance of reduced financial guidance.  In doing so, the Individual Defendants deceptively claimed confidence in their planned efforts to expand their user base, particularly with a younger audience, and optimize the app experience.

50.    On March 4, 2024, Defendants Jones and Subramanian presented on behalf of Bumble at Morgan Stanley's Technology Media & Telecom Conference 2024.

51.    During the presentation, certain defendants highlighted their confidence in the Bumble app's relaunch and corresponding revamp of the Premium Plus subscription tier to drive ARRPU growth during the following question-and-answer segment, in pertinent part, as follows:

<Q: Nathanial Jay Feather – Morgan Stanley – Research Associate> Okay. Great. And one more on the flip side of payers is also [ARPPU] I guess, looking to '24, how should we think about that balance between the payer growth you just mentioned? And then our [ARPPU growth] how that should trend through the year?

***

<A: Lidiane Jones> I may add a couple of points to what Anu shared. When you look at net adds, one of the key factors that we are looking at is quality net adds. ***We want our users coming into the platform that are going to engage and stay in the platform.*** And so we're really measuring the duration and engagement of those users. We're not trying to just get a total number of net adds that churn out. So that's a really important part of our growth strategy moving forward.

***And then the ARPPU, one of the big things that we're doing, especially with our Q2 launch, is looking at the value -- clarity of value across the different tiers that we're offering***. And as we've seen, Bumble has been tremendously successful at this at the -- in its history, customers. ***A lot of our customers are at the premium tier, but we didn't see as much retention of our customers when we launched Premium+.***

***So we are adding more capabilities to Premium+ so that users stay there. So you see a natural -- to Anu's point, natural sustainability of our ARPPU towards the higher tiers because our users will see greater value at staying at there***. So we're really excited about that. ***I think that release is going to provide greater value to ARPPU goals this year and moving forward as well.***

<Q: Nathanial Jay Feather> Okay. Great. Well, I want to take just a touch more into that on Bumble Premium+ the high-end tier. I guess what do you think were the primary reasons why that wasn't getting the adoption you had anticipated? And then with the relaunch, I guess, how should we think about the payer funnel between Bumble Premium, Bumble Premium+ and how that should move going forward?

<A: Lidiane Jones> Yes. **We learned a tremendous amount since the December launch of the Premium+**. One of the areas that we emphasize to this particular offering was just giving more of everything. So you think have more swipes, more highlights and that certainly drives demand. And we saw really solid demand for it. A lot of users signed up. What caused -- so we're still net revenue positive with it. So it's not a terrible release, **but we're not seeing the sustainability of people staying in that Premium offering. They're going back down to Premium instead of staying on Premium+.**

So what we are focusing on is adding features -- unique features that you only get if you are a Premium+. So that way, there is a sustained value at staying at that offering. Premium has been incredibly successful. So we know we're not churning out our users they're staying with us, they're just going down to Premium instead of staying in Premium+. So great demand is not sustaining those users.

**Features now that will add regular value, some of them focused on engagement metrics and insights, what are people reacting to the most in terms of features or opening moves or opening statements that users are making to that initial matching connection.** We can provide a lot of those insights. Again, those are AI-powered capabilities that help our users gain more insight and more value to what they're getting out of that offering. So we just want to, again, seize the demand that we saw and sustain it, which will help our people overall.

<Q: Nathaniel Jay Feather> Okay. Great. Now we talked a little bit about the relaunch earlier. But I want to really dive into that planned launch coming up in 2Q, so relatively soon. Can you talk through in a bit more depth, the real rationale behind going through the relaunch? And then how should investors think about the features and product goals and what will really mark a successful relaunch there?

<A: Lidiane Jones> Yes, it's a great question. **The team had been looking at a lot of different areas of customer feedback and different pockets of improvements on the product.** But if you heard in my earnings call, one of the key learnings for me coming in is that things are being done very siloed. Even some of our own testing was being done very siloed. Is this particular feature testing? And what we've done is done a full end-to-end look at what is driving engagement? What is driving actual conversion and retention of these users? It's the full experience. It's not just one isolated feature.

***So this release is really focused on the end-to-end customer success.*** So some of the features that we -- pockets of customer feedback, profile experience. We haven't dramatically changed that over the last few years. ***So we are really revamping our profile experience with shortening that overall set of steps***. We're still using questions that are more comfortable for people to engage in, which has translated in terms of what we have seen on the rollout of it. From a testing perspective, we are seeing higher-quality profiles, higher engagement and higher conversion.

***So I think there's just a real truth to when you do right by your customers, they will be happier***. So that profile is a big part of what we're changing. A couple of other capabilities that we're looking at is enhancing that first experience. You may know Bumble, like everybody knows Bumble, as women make the first move. If you ask women, especially younger women, we're pretty tired of having to make the first move all the time. So this release is going to be a next generation of women's empowerment. This is going to be about women decide if they want to make the first move.

So that's a pretty big change for Bumble and one that we're incredibly excited about. So this is a Bumble's year for you or all of our audience. And then the last thing is we're adding some additional, as I mentioned the insights more differentiated experience for Premium+. And we're adding some more safety capabilities, especially as it relates to ID verification. ***So I'm really -- again, it's a full revamp of the product. I'm probably not doing justice. There's a lot more features that the team is working on. But I am thrilled. This is -- us setting the next decade of women's experience and dating for Bumble, which I'm thrilled about.***

(Emphasis Added).

52.     On May 8, 2024, Bumble published its first quarter fiscal 2024 results and reiterated the Company's full year 2024 guidance.

53.     A corresponding earnings call was held the same day during which certain of the Individual Defendants spoke on their app relaunch and plans for their Premium Plus subscription tier.  Defendant Jones stated:

> That brings us to our Bumble App relaunch last week, where we showcased the first chapter of our extended vision for Bumble and how we're innovating to make our customers' dating experience even better.  Our refreshed brand identity and new product features are designed to support 3 goals; improve the core experience of our customers, enhance trust and safety and increase our options for monetization.

*** 

Finally, we're expanding monetization with our updated Premium+ subscription tier. We continue to have conviction that our subscription tiers are designed to bring value to our customers by offering them the fastest path to finding their matches. Premium+ is built on this principle, and we increased its value in this release by updating the feature set with personalized photo insights and better match curation.

We see Premium+ as a valuable future revenue stream and expect to continue to add additional features and optimize pricing for the subscription tier. Beyond Premium+, we're continuing to run global pricing optimization and expanding further into existing growth markets in Western Europe, LatAm and Asia. Overall, the Bumble app launch feedback from customers has been tremendously valuable to us.

54.     The above-referenced statements were materially false and/or misleading. The Individual Defendants created the false impression that they possessed reliable information pertaining to their consumer market, resulting in the Individual Defendants' confidence that the relaunch of the Bumble app, its associated marketing campaign, and the connected revamp of the Company's Premium Plus subscription tier would boost the Company's growth through an expanded user base and increased revenue per paid user in the second half of the year. To the contrary, the Individual Defendants expectations had little, or an otherwise erroneous, basis. In truth, much like Bumble's Premium Plus pricing tier, the Company's app relaunch was merely a desperate attempt to keep pace with competition overshadowing Bumble's growth in the sector.

55.     On August 7, 2024, the Company announced mixed 2Q24 results and drastically cut FY24 projections as follows: total revenue year over year growth in the range of 1% to 2% and Bumble App revenue growth in the range of 1.5% to 2.5%.  Regarding the adjusted EBITDA margin growth: at least 200 basis points.

56.     During the same-day earnings call, Defendant Jones made it clear this "projection reset" is the result of Bumble's "difficult but important decision to reset our strategy to deliver

durable customer value by addressing two fundamental and interconnected challenges." She continued:

> First, we need to ensure we're capturing the right balance and mix of people in our customer ecosystem. This entails correcting demographic imbalances and improving retention by providing our customers with more innovative and compelling dating experiences.

> And second, we need to monetize more effectively while ensuring a great experience for both our free and paid customers

> \*\*\*

> Over time, we'll rebalance Bumble subscription tiers and merchandising in favor of mechanisms that reward positive peer behaviors and support better ecosystem health. ***As part of this process, we'll slow down certain monetization initiatives in the near term, including the extension of Premium+.***

(Emphasis added).

57.    Defendant Subramanian detailed the financial outlook in accord, stating:

> Now moving on to our outlook for the rest of the year. ***We are intentionally resetting our outlook today that reflect the execution of the customer-focused strategy Lidiane just outlined.*** In the process of strengthening our ecosystem and improving the customer experience, we plan to prioritize product and marketing investments that will improve engagement and ecosystem health, particularly in our more mature market. This will include expanding our efforts around safety and improving the mix and intent of customers on our app.

> In addition, as we align our revenue strategy to deliver broader customer value across all subscription tiers, ***we will also slow down certain monetization efforts like Premium+ that we had originally planned for in the second half of the year***. All of these factors in aggregate will impact our near-term top-of-funnel user growth and monetization but we have high confidence that these are the necessary steps for us to reignite user growth, drive sustainable revenue and capture customer value in the long term

> \*\*\*

> For full year 2024, we now expect total Bumble Inc. revenue growth between 1% and 2%. We expect Bumble App revenue growth between 1.5% to 2.5% with full year Bumble App Net adds of approximately 275,000 to 285,000. This implies that we expect to see negative net adds in Q4 of this year. While this is partly driven by seasonality, it primarily reflects the actions I just outlined.

(Emphasis added).

58.     The aforementioned press release and statements made by the Individual Defendants were misleading and in direct contrast to their prior statements, including those made during the February 27, 2024, March 4, 2024, and May 8, 2024, earnings calls and presentations. On those calls, the Individual Defendants confidently claimed that the app relaunch and the integrated revamp of the Premium Plus subscription service were focused on customer-focused desires and would improve the Bumble App experience, improve the Company's brand identity, and drive revenue growth in the back half of 2024 and onward. In truth, Bumble had yet to successfully monetize its updated Premium Plus subscription tier, calling it a "future revenue stream" and was still working on improving the core experience, as well as trust and safety, from user perspectives. The Individual Defendants misled investors by providing the public with materially flawed statements of confidence and growth projections which did not account for these variables.

59.     A number of well-known analysts who had been following Bumble reported on the Company's lowered guidance in response to Bumble's disclosures. For example, RBC Capital Markets released a statement regarding Bumble's recent issues, stating:

> To say BMBL had a tough qtr would be an understatement. Through a combination of top-of-funnel softness and self-inflicted pullbacks on monetization tools, the company guided down significantly and has gone back to the literal drawing board on product development to drive better virality, user experience and ultimately monetization

60.     Similarly, Piper Sandler released a statement on Bumble's shockingly low current estimates, as well as the Company's uncertain future, stating:

> While we were expecting estimates to get reset, we were certainly not expecting the revision to be of this magnitude. The strategy has quickly pivoted from an app refresh to a full-blown multi-quarter revamp. To us, the biggest uncertainty coming

out of the print remains whether estimates have been cut enough or are we in a position for a few more quarters of choppiness.

61.     As a result, investors and analysts reacted immediately to Bumble's revelations. The price of Bumble's common stock declined dramatically. From a closing market price of $8.06 per share on August 7, 2024, Bumble's stock price fell to $5.71 per share on August 8, 2024.

### SHARE REPURCHASES

62.     On November 7, 2023, the first day of the Relevant Period, while certain of the Individual Defendants were touting the foregoing false and misleading statements to the market, thus artificially inflating the Company's share price, the Director Defendants authorized an increase in the amount in the share repurchase program $150.0 million to $300.0 million. The Director Defendants then authorized a further increase in the Company's share repurchase program in May 2024 from $300.0 million to $450.0 million.

63.     Having authorized this share repurchase program, the Individual Defendants caused the Company to repurchase its own common stock at artificially inflated prices, as reflected in the below table, thus causing substantial harm to the Company.

| Date | Shares Repurchased | Avg. Share Price ($) | Total Cost ($) | Harm to the Company ($)[1] |
|---|---|---|---|---|
| November 2023 | 2,500,000 | 14.45 | 36,125,000 | 21,850,000 |
| December 2023 | 7,204,247 | 13.90 | 100,139,033 | 59,002,783 |
| January 2024 | 1,441,770 | 13.87 | 19,997,350 | 11,764,843 |
| March 2024 | 5,845,903 | 11.02 | 64,421,851 | 31,041,745 |
| **TOTAL** | **16,991,920** | **--** | **$220,683,234** | **$123,659,371** |

---

[1]     "Harm to the Company" refers to how much the Company overpaid for its own common stock by repurchasing it at artificially inflated prices and is calculated by subtracting what the Company should have paid for its stock (at $5.71 per share, as it was when the truth was revealed) from the "Total Cost," *i.e.*, what the Company actually paid for its common stock.

64.     As such, the Individual Defendants, while issuing false and misleading statements to the market, caused the Company to repurchase over 16.9 million shares of its own common stock at artificially inflated prices, causing it to overpay for its own stock by over *$123.6 million*.

65.     Such harmful actions could not be the product of informed business judgment, nor could they be construed as being in the best interests of the Company. As a result, the Company has suffered substantial harm which was caused by, or otherwise permitted by, each of the Individual Defendants, in direct violation of their fiduciary duties owed to the Company.

<u>**DAMAGE TO THE COMPANY**</u>

**<u>Securities Class Action</u>**

66.     On September 24, 2024, a securities class action complaint was filed in the United States District Court for the Western District of Texas against the Company the Officer Defendants. The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5, in the case captioned: *Holzer v. Bumble Inc., et al.*, Case 1:24-cv-01131 (W.D. Tex.) (the "Securities Class Action").

67.     As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers.  The Company will continue to incur significant sums in relation to the Securities Class Action and any liability or settlement that results.

**<u>Share Repurchases</u>**

68.     As detailed above, the Director Defendants authorized a harmful share repurchase program which enabled the Individual Defendants to cause the Company to repurchase its own common stock at artificially inflated prices, caused by the false and misleading statements that certain of the Individual Defendants touted. As such, the Individual Defendants caused, or

otherwise permitted, the Company to repurchase over 16.9 million shares of its own common stock for a total in excess of $220.6 million, causing damage to the Company in excess of $123.6 million.

**Unjust Compensation**

69.     At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

70.     Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner.  Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

71.     However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein.  Because the Individual Defendants failed to carry out their respective duties, the compensation they received during the Relevant Period was excessive and undeserved.  As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Insider Trading**

72.     Defendants Hsiao and Mather while in possession of material, non-public information (described *supra*), collectively sold over 12,800 shares of Bumble common stock at artificially inflated prices during the Relevant Period, reaping over $148,200 in personal proceeds.

73.     Specifically, Defendant Hsiao received a material personal benefit from her insider trading, selling 5,496 shares of artificially inflated Company common stock for personal profits of $67,717. Defendant Mather also received a material personal benefit from her insider trading, selling 7,492 shares of artificially inflated Company common stock for personal profits of $85,506.

74.     While both of these trades were made pursuant to a 10b5-1 trading plan, these trading plans were adopted in March 2024, at the same time the Individual Defendants continued to mislead investors by misrepresenting their understanding of the issues they claimed the new pricing tier and Bumble app relaunch were aimed to address in their issuance of reduced financial guidance. The fact that these trading plans were put into place after the Relevant Period began, and at the same time that the Individual Defendants continued to mislead the market after the truth first started to emerge is suspicious and leads to the inference that Defendants Hsiao and Mather adopted these plans to disguise their illicit insider trades made with material, non-public information.

**Additional Damage to the Company**

75.     In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

76.     The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

77.     The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward.

## CORPORATE GOVERNANCE

78.     At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members. Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

79.     Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

### Code of Conduct

80.     At all relevant times, the Company had in place its Code of Conduct which applied to "every director, officer, and employee of Bumble Inc. and its subsidiaries." From the outset, the Code of Conduct provides that Bumble's core values are:

• **Growth**: Our collective priority is driving growth and delivering meaningful value to our users, our business, and our teammates by embracing challenges, taking risks, and using learnings to go after ever greater opportunities.

• **Make the first move**: We take initiative to advance the mission and the business, moving quickly and with focus, rigor, and intent.

• **Honesty**: We foster constructive and respectful honesty on our platforms and our teams, operating with directness and the intention of raising the bar for all.

• **Kindness**: We create environments where kindness and respect are paramount, both in our products and in our culture.

• **Accountability**: We all take ownership of our objectives and our roles in advancing the mission and growing the business. And we all take responsibility for the safety and well-being of our Bumble and Badoo communities.

• **Inclusivity**: We are a global company and embrace differing perspectives and the opportunity to collaborate with teammates of diverse backgrounds, beliefs, and cultures, bringing others along in pursuit of our goals.

81.     In a section entitled "Accurate Records," the Code of Conduct states:

We maintain complete and accurate records so that we can make responsible business decisions and provide full, fair, accurate, timely, and understandable disclosure in reports and documents Bumble submits to the Securities and Exchange Commission and other government agencies and in other public communications.

**Why We Do What's Right**

Bumble depends on proper records for making strategic and informed decisions, building trust with stockholders and users, and complying with and enforcing the law. As a public company, securities laws require Bumble to maintain our records accurately and to disclose full information about our business and financial performance in a timely manner.

**How We Live Our Code**

We maintain the integrity of our books and records by:

• Complying with generally accepted accounting principles, internal controls, and all relevant laws and regulations.

• Recording all assets, liabilities, revenues, expenses, and business transactions completely, accurately, in the proper period, and in a timely manner.

• Ensuring that records are submitted to internal and external auditors promptly and accurately.

• Never misleading or misinforming anyone about our business operations or finances.

• Reporting any concern that a record is inaccurate, false, or misleading to the Audit Committee.

• Identifying, maintaining, safeguarding, and disposing of records in accordance with Bumble's records retention schedule.

• Ensuring records are easily accessible and maintained in an organized and secure environment.

• Never selectively editing or discarding records that have not met their retention requirements, nor directing anyone else to do so.

• Retaining and providing complete and accurate records promptly if they are requested in connection with a legal hold, audit, or investigation.

82.      In a section entitled "Company Assets," the Code of Conduct states:

We take care of Bumble's assets because they are the building blocks for our future, helping us better serve our users and create value for our stockholders.

**Why We Do What's Right**

Bumble's assets are the result of hard work by all of our employees, past and present. Our profitability and sustainable growth over the long term require that we protect and use our assets wisely.

**How We Live Our Code**

We preserve the value of our physical, information, intangible, and financial assets when we:

• Take all reasonable steps to ensure that Bumble assets are not damaged, abused, wasted, lost, or stolen.

• Demonstrate good judgment in using information and communications systems, and the electronic data they store, process, or transmit.

• Always handle company funds honestly, responsibly, and in accordance with Bumble policies.

• Report any abuse or misuse of Bumble assets to People & Culture, Legal, or the Bumble Ethics Hotline.

**<u>Supplemental Code of Ethics</u>**

83.      As a supplement to the foregoing Code of Conduct, Bumble also has in place its

Supplemental Code of Ethics for Senior Financial Officers which "promote[s] honest and ethical

conduct and compliance with applicable law, particularly as related to the maintenance of the

Company's financial books and records and the preparation of its financial statements."

84.     Specifically, Senior Financial Officers, including the CFO, CEO, and principal accounting officer, have the following responsibilities:

1. Engage in and promote ethical conduct.

2. Carry out their responsibilities honestly, in good faith and with integrity, due care and diligence, exercising at all times their best independent judgment.

3. Assist in the production of full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission and other regulators and in other public communications made by the Company.  Accordingly, it is the responsibility of each Senior Financial Officer promptly to bring to the attention of the Company's Disclosure Committee any material information of which he or she may become aware that affects the disclosures made by the Company in its public filings and other public communications.

4. Promptly bring to the attention of the Chief Legal Officer and Chief Financial Officer and to the Audit Committee of the Board of Directors (the "Audit Committee") any information he or she may have concerning (a) significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

5. Comply with applicable laws, rules and regulations of federal, state and local governments and other appropriate regulatory agencies and promptly bring to the attention of the Chief Legal Officer any information he or she may have concerning evidence of a material violation of the securities or other laws, rules or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof, unless the evidence of such material violation involves the Chief Legal Officer in which case the matter should be brought to the attention of the Chief Executive Officer and the Audit Committee.

6. Promptly bring to the attention of the Chief Legal Officer any violation of the Code of Conduct or this Supplemental Code, including any potential conflicts of interest between personal and professional relationships, involving any management or other employees who have a significant role in the Company's financial reporting, disclosure controls or internal control over financial reporting, unless the violation involves the Chief Legal Officer in which case the matter should be brought to the attention of the Chief Executive Officer and the Audit Committee.

7. Never take, directly or indirectly, any action to coerce, manipulate, mislead or fraudulently influence the Company's independent auditors in the performance of their audit or review of the Company's financial statements.

**Audit and Risk Committee Charter**

85.     At all relevant times, the Company had in place its Audit and Risk Committee Charter which set forth the additional responsibilities and duties of the Audit and Risk Committee. From the outset, the Audit and Risk Committee Charter states that:

The Audit and Risk Committee (the "Committee") shall:

A. Provide assistance to the Board of Directors (the "Board of Directors") of Bumble Inc. (the "Company") with respect to its oversight of:

(i) The quality and integrity of the Company's financial statements, as well as oversight of the Company's accounting and financial reporting processes and financial statement audits;

(ii) The effectiveness of the Company's control environment, including internal controls over financial reporting;

(iii) The Company's compliance with legal and regulatory requirements applicable to financial statements and accounting and financial reporting processes;

(iv) The independent registered public accounting firm's qualifications, performance and independence;

(v) The effectiveness of the Company's risk management processes, particularly with respect to financial risk exposure;

(vi) The performance of the Company's internal audit function; and

(vii) The Company's technology security and data privacy programs.

B. Prepare the audit committee report required by the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement.

86.     The Audit and Risk Committee Charter further sets forth the following responsibilities and duties of the Audit and Risk Committee members, in relevant part:

Documents/Reports Review

[] Review and discuss with management and the independent registered public accounting firm prior to public dissemination the Company's annual audited financial statements and quarterly financial statements, including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

[] Review and discuss with management and the independent registered public accounting firm the Company's earnings press releases (paying particular attention to the use of any "pro forma" or "adjusted" non-GAAP information and measures), as well as financial information and earnings guidance provided to analysts and rating agencies.  The Committee's discussion in this regard may be general in nature (e.g., discussion of the types of information to be disclosed and the type of presentation to be made) and, with respect to financial information and earnings guidance provided to analysts and ratings agencies, need not take place in advance of each instance in which the Company may provide such financial information or earnings guidance to analysts and ratings agencies.

[] Review and discuss with management and the independent registered public accounting firm any major issues arising as to the adequacy and effectiveness of the Company's internal controls, any actions taken in light of material control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting. To the extent the Committee deems it appropriate, review and discuss with management any major issues arising as to the adequacy and effectiveness of the Company's disclosure controls and procedures and any actions taken in light of material control deficiencies.

***

<u>Accounting and Financial Reporting Process</u>

[] In consultation with the independent registered public accounting firm, management and the internal auditors (or other personnel or service providers responsible for the internal audit function), review the integrity of the Company's financial reporting processes.  In that regard, the Committee must obtain, review and discuss with management and the independent registered public accounting firm reports from management and the independent registered public accounting firm regarding:

- all critical accounting policies and practices to be used by the Company;

- analyses prepared by management and/or the independent registered public accounting firm setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including all alternative treatments of financial information within generally accepted accounting principles related to material items

that have been discussed with the Company's management, the ramifications of the use of the alternative disclosures and treatments on the Company's financial statements and the treatment preferred by the independent registered public accounting firm;

- major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles;

- major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; and

- any other material written communications between the independent registered public accounting firm and the Company's management, such as any management letter or schedule of unadjusted differences.

[] Review periodically the effect of regulatory and accounting initiatives, as well as off-balance sheet structures (if any), on the financial statements of the Company.

***

Legal Compliance / General

[] Review and discuss with management and the independent registered public accounting firm the Company's guidelines and policies with respect to risk assessment and risk management.  The Committee should discuss the Company's major risk exposures, including operational, financial (including the risk of fraud), data privacy and security, legal, regulatory and reputational risks, and the steps management has taken to monitor and control such exposures.

[] Oversee, review and periodically update the Company's Code of Conduct (the "Code") and Supplemental Code of Ethics for Senior Financial Officers (the "Supplemental Code") (including, in each case, review of any significant violations thereof and review of requests of waivers thereof by executive officers and directors) and the Company's system to monitor compliance with and enforce the Code and the Supplemental Code.  The Committee will review the implementation and effectiveness of the policies set forth in the Code and the Supplemental Code and the Company's overall compliance program at least annually with management and the Company's Chief Legal Officer.  The Chief Legal Officer has express authority to communicate personally at any time with the Chairperson about compliance matters.

***

Reports

34

[] Report regularly to the Board of Directors including:

(i) with respect to any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the qualification, performance and independence of the Company's independent registered public accounting firm or the performance of the internal audit function;

(ii) following meetings and unanimous consents of the Committee; and

(iii) with respect to such other matters as are relevant to the Committee's discharge of its responsibilities.

## DUTIES OF THE DIRECTOR DEFENDANTS

87.     As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

88.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

89.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

90.     Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or

directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

91.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state

securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

92.     Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.   The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

93.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company.   As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

94.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Director Defendants.

95.     Plaintiff will adequately and fairly represent the interests of the Company and its

shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

96.     Plaintiff is a current owner of the Company's common stock and has continuously been an owner of Company's common stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein. Plaintiff understands his obligation to hold Bumble stock throughout the duration of this action and is prepared to do so.

97.     During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

98.     The Company Board is currently comprised of eleven (11) members – including Defendants Wolfe Herd, Mather, Jones, Atchison, Steele, Thomas-Graham, Bromberg, Korngold, Griffin, Hsiao, and Non-Party Martin Brand ("Brand"). Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.,* six (6), cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

99.     Each of the Director Defendants face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein.  Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

100.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith

effort to prevent or remedy that situation.

101.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

102.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

103.    Each of the Director Defendants, by virtue of their roles, were required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, the Director Defendants failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

104.    As trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets.

105.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the

Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein, and are therefore not disinterested parties.

106.    Each of the Director Defendants reviewed, authorized, signed, and thus personally made and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

107.    Additionally, each of the Director Defendants authorized the harmful share repurchase program and its subsequent increases in the amount of stock to be repurchased thereunder while knowing that the Company's share price was artificially inflated as a result of the false and misleading statements. Despite this, the Director Defendants caused, or otherwise permitted, the Company to repurchase substantial amounts of its own common stock at those artificially inflated prices, causing damage in excess of $123.6 million to the Company. As such, each of the Director Defendants have wasted valuable corporate assets, face a substantial likelihood of liability therefor, and cannot exercise independent business judgment in deciding whether to institute and vigorously prosecute any action against the Individual Defendants.

**THE DIRECTOR DEFENDANTS ARE**
**NOT INDEPENDENT OR DISINTERESTED**

**Defendant Jones**

108.    Defendant Jones is neither disinterested nor independent and is thus incapable of considering a demand to sue because she (as its CEO) is an employee of the Company who derives substantially all of her income from her employment with the Company, making her not independent.  As such, Defendant Jones cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability and

threaten her livelihood.

109.    As CEO, Defendant Jones also fails the NASDAQ bright-line independence test as set forth in NASDAQ Listing Rule 5605(a)(2) and cannot, therefore, be considered independent, as admitted by the Company in its 2024 Proxy Statement. As such, Defendant Jones could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Jones is therefore futile.

110.    Defendant Jones also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as a main perpetrator of the wrongdoing alleged herein, Defendant Jones is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot consider a demand to sue.

111.    In addition, Defendant Jones receives lucrative compensation in connection with her employment with the Company. Defendant Jones is not independent from Defendants Steele, Thomas-Graham, and Korngold as they comprise the Compensation Committee and are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Jones. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers.  Because of her status as an inside director, and the concomitant substantial compensation she receives, Defendant Jones could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for her financial future.

112.    Because of Defendant Jones's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Jones is unable

to comply with her fiduciary duties and prosecute this action. Defendant Jones is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending herself in the Securities Class Action.

**Defendant Wolfe Herd**

113.     Defendant Wolfe Herd is neither disinterested nor independent and is thus incapable of considering a demand to sue because she (as its Executive Chairman) is an employee of the Company who derives substantially all of her income from her employment with the Company, making her not independent.  As such, Defendant Wolfe Herd cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability and threaten her livelihood.

114.     As Executive Chairman, Defendant Wolfe Herd also fails the NASDAQ bright-line independence test as set forth in NASDAQ Listing Rule 5605(a)(2) and cannot, therefore, be considered independent, as admitted by the Company in its 2024 Proxy Statement. As such, Defendant Wolfe Herd could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Wolfe Herd is therefore futile.

115.     Moreover, as the Company's founder, Defendant Wolfe Herd is inherently interested in the Company and could not, therefore, consider a demand to sue those Individual Defendants who control and are responsible for the future of Defendant Wolfe Herd's Company.

116.     Defendant Wolfe Herd also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as a main perpetrator of the wrongdoing alleged herein, Defendant Wolfe Herd is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot consider a demand to sue.

117.   In addition, Defendant Wolfe Herd receives lucrative compensation in connection with her employment with the Company. Defendant Wolfe Herd is not independent from Defendants Steele, Thomas-Graham, and Korngold as they comprise the Compensation Committee and are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Wolfe Herd. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers.  Because of her status as an inside director, and the concomitant substantial compensation she receives, Defendant Wolfe Herd could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for her financial future.

118.   Because of Defendant Wolfe Herd's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Wolfe Herd is unable to comply with her fiduciary duties and prosecute this action. Defendant Wolfe Herd is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending herself in the Securities Class Action.

**Defendants Jones and Steele**

119.   Defendants Jones and Steele are each conflicted by virtue of their longstanding business relationship with each other stemming from their overlapping time at Salesforce. Specifically, Defendant Jones served as CEO of Salesforce from December 2022 through to January 2024. At the same time, Defendant Steele served as a member of Salesforce's advisory board from 2021 through to 2024. Thus, for the duration of Defendant Jones' tenure at Salesforce, both Defendant Jones and Steele worked alongside one another in leading Salesforce and built a professional relationship as a result. As such, each of these Defendants are indebted to one another

and could not reasonably and objectively consider a demand to sue each other for the wrongdoing alleged herein. Accordingly, demand is futile as to each of them.

**Defendant Korngold and Non-Party Brand**

120.    Defendant Korngold and Non-Party Brand are each conflicted by virtue of their longstanding business relationship with each other stemming from their positions with Blackstone, the Company's largest shareholder. Specifically, Defendant Korngold has been with Blackstone since 2019 and presently serves as a Senior Managing Director and Global Head of Blackstone's Growth Equity Business. Meanwhile, Non-Party Brand has been with Blackstone since 2003 and presently serves as Head of North America Private Equity and Global Co-Head of Technology Investing. Both Defendant Korngold and Non-Party Brand have cultivated a professional working relationship with one another while holding these senior roles at Blackstone together. As such, each of Defendant Korngold and Non-Party Brand are indebted to one another and could not reasonably and objectively consider a demand to sue each other for the wrongdoing alleged herein. Accordingly, demand is futile as to each of them.

121.    Moreover, Blackstone is one of the Company's largest shareholders and are entitled to appoint directors to the Company's Board. As such, Blackstone has appointed Defendant Korngold and Non-Party Brand to serve on the Company's Board. Thus, Defendant Korngold and Non-Party Brand are conflicted and unlikely to institute proceeds against the Company which could have an unpredictable impact on their employer's holdings. Accordingly, demand is futile as to each of them.

**Defendants Hsiao and Mather**

122.    Defendants Hsiao and Mather, by virtue of their senior roles within Bumble, have access to material information about the Company, as described above, which was not generally

available to the public. While in possession of this material, non-public information, Defendants Hsiao and Mather took advantage of the Company's artificially inflated stock price and personally sold Bumble common stock in order to reap inflated proceeds.

123.     Specifically, Defendant Hsiao received a material personal benefit from her insider trading, selling 5,496 shares of artificially inflated Company common stock for personal profits of $67,717. Defendant Mather also received a material personal benefit from her insider trading, selling 7,492 shares of artificially inflated Company common stock for personal profits of $85,506.

124.     Accordingly, both Defendants Hsiao and Mather personally benefitted from the wrongdoing alleged herein and face a substantial likelihood of liability therefor, thus demand is excused as to each of them.

**Defendants Atchison, Steele and Thomas-Graham**

125.     During the Relevant Period, Defendants Atchison, Steele, and Thomas-Graham served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia,* overseeing the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company and the audits of the financial statements of the Company, and otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein.

126.     Defendants Atchison, Steele, and Thomas-Graham breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting and business reporting issues and deficiencies described above. Therefore, Defendants Atchison, Steele, and Thomas-Graham face a substantial likelihood of liability for their

breach of fiduciary duties and any demand upon them is futile.

**Additional Reasons Demand is Futile**

127. The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

128. The Company, at all material times, had its Code of Conduct and related corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite this Code of Conduct and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

129. In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

130. The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board.

They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

131.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

132.    Publicly traded companies, such as Bumble, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Director Defendants will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event.

133.    Accordingly, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Director Defendants is futile and, thus, excused.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

**(Against the Individual Defendants for Breach of Fiduciary Duties)**

134.    Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

135.    The Individual Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

136.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

137.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

138.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

139.    As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

**SECOND CAUSE OF ACTION**

**(Against the Individual Defendants for Gross Mismanagement)**

140.     Plaintiff incorporates by reference and re-allege each allegation contained above, as though fully set forth herein.

141.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

142.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

143.     Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

### THIRD CAUSE OF ACTION

### (Against the Individual Defendants for Waste of Corporate Assets)

144.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

145.     The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

146.     As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Officer Defendants' unlawful actions; and (iv) causing and/or permitting the Company to repurchase its

own common stock at artificially inflated prices.

147.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

## **FOURTH CAUSE OF ACTION**

### **(Against the Individual Defendants for Unjust Enrichment)**

148.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

149.    By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company

150.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

151.    Plaintiff, as a shareholder and representative of the Company seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## **FIFTH CAUSE OF ACTION**

### **(Against the Director Defendants for Aiding and Abetting)**

152.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

153.    The Director Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Officer Defendants. Likewise, the Officer Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Director Defendants.

154.    Specifically, the Director Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Company to engage in the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Officer Defendants' violations of law as alleged herein, and failing to report the same. In addition, the Director Defendants authorized the harmful share repurchase program thereby aiding and enabling the Individual Defendants to cause the Company to repurchase its own common stock at artificially inflated prices.

155.    The Officer Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Officer Defendants' lack of oversight and scheme to issue materially false and misleading statements to the Company's shareholders and also cause the Company to repurchase its own common stock at artificially inflated prices, by facilitating and disguising the Director Defendants' violations of law as alleged herein, and failing to report the same.

156.    As a result, the Director Defendants substantially assisted the Officer Defendants, and the Officer Defendants substantially assisted the Director Defendants in breaching their fiduciary duties and in committing the other wrongful and unlawful conduct as alleged herein.

157.    As a direct and proximate result of the aiding and abetting the breaches of fiduciary duty alleged herein, the Company has sustained and will continue to sustain significant damages.

158.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

### SIXTH CAUSE OF ACTION

### (Against Defendants Hsiao and Mather for Insider Trading)

159.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

160.    By reason of their fiduciary role as officers and directors of the Company, Defendants Hsiao and Mather (the "Insider Trading Defendants") specifically owed the Company the highest obligation of due care, good faith, and loyalty.

161.    As directors of the Company, the Insider Trading Defendants were given access to material information about the Company, as described above, which was not generally available to the public.

162.    When the Insider Trading Defendants sold their Company stock, as detailed *supra*, they were in possession of material, non-public information described above and sold Company stock on the basis of such information for collective gross proceeds in excess of $147,200.

163.    The information described above was proprietary, non-public information concerning the Company's business operations and financial condition.  It was a proprietary asset belonging to the Company, which the Insider Trading Defendants misappropriated to their own benefit when they sold holdings in Company stock.  The Insider Trading Defendants knew that this information was not intended to be available to the public. Had such information been generally available to the public, it would have significantly reduced the market price of Company stock.

164.    As the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Trading Defendants' fiduciary duties, the Company is entitled to disgorge any illegal profits obtained thereby.

### SEVENTH CAUSE OF ACTION

**(Against the Individual Defendants for Violations of Section 10(b) of the
Securities Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder)**

165.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

166.    During the Relevant Period, the Individual Defendants disseminated and/or approved public statements that failed to disclose that the above-referenced truthful facts and as a result of the foregoing, the Individual Defendants' public statements were materially false and misleading at all relevant times.  Thus, the price of the Company's shares was artificially inflated due to the deception of the Individual Defendants.  Despite this artificial inflation in the price of the Company's shares, the Individual Defendants caused and/or allowed the Company to repurchase many millions of shares of Company stock, thereby causing significant financial harm to the Company.

167.    As alleged herein, the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Bumble, their control over, and/or receipt and/or modification of Bumble's allegedly materially misleading statements and/or their

associations with the Company which made them privy to confidential proprietary information concerning Bumble, participated in the fraudulent scheme alleged herein.

168.    The Individual Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Relevant Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

169.    The Individual Defendants were each members of Bumble's Board of Directors and senior management team during the aforesaid time period.  Based on their roles at Bumble, each of the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

170.    At a minimum, the Individual Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions.  Given the nature and extent of the problems at Bumble, the Individual Defendants knew and/or recklessly disregarded the extent and scope of their statements during the Relevant Period.

171.    Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.  The Individual Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded,

that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

172.    As such the Individual Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; and (ii)  made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

173.    As a result of the wrongful conduct as alleged herein, the Individual Defendants have violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and are thus liable for any harm caused to the Company.

### REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.      Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.      Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of their fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment, aiding and abetting, and violations of § 10(b) of the Securities Exchange Act of 1934;

C.      Awarding, against all the Insider Trading Defendants, disgorgement of all illicitly gained proceeds as a result of their unlawful and disloyal insider trading;

D.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing

governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

   E.  Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

   F.  Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

   Plaintiff demands a trial by jury on all issues so triable.

Dated:  October 31, 2024

          **THE BROWN LAW FIRM, P.C.**

          By: */s/ Saadia Hashmi*
            Saadia Hashmi
          767 Third Avenue, Suite 2501
          New York, NY 10017
          Telephone: (516) 922-5427
          Facsimile: (516) 344-6204
          Email: shashmi@thebrownlawfirm.net

          **GAINEY McKENNA & EGLESTON**
          Gregory M. Egleston
          260 Madison Ave., 22nd Floor
          New York, NY 10016
          Tel: (212) 983-1300
          Fax: (212) 983-0383
          Email: gegleston@gme-law.com

            *Attorneys for Plaintiff*

**VERIFICATION**

 I, SEAN GAVIN, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Bumble, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Bumble, Inc. common stock at all relevant times.

SEAN GAVIN    OCT 30 2024